UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-10010-RGS

WILLIAM REMINGTON and MUSAN DURAKOVIC,
on behalf of themselves and others similarly situated

v.

J.B. HUNT TRANSPORT, INC.

---

CIVIL ACTION NO. 15-13019-RGS

ABE SILFANI,
on behalf of himself and others similarly situated

v.

J.B. HUNT TRANSPORT, INC.

MEMORANDUM AND ORDER ON DEFENDANT'S
CONSOLIDATED MOTION TO DISMISS

September 16, 2016

Stearns, D.J.

Plaintiffs are owner-operator truck drivers for defendant J.B. Hunt Transport Inc., a freight and package delivery service. They allege that J.B. Hunt improperly classified them to their detriment as independent contractors, instead of company employees. J.B. Hunt moves to dismiss the

two Complaints as preempted by the federal Truth-in-Leasing regulations, 49 C.F.R. Part 376.

## BACKGROUND

William Remington and Musan Durakovic contracted with J.B. Hunt as owner-operator drivers[1] in October and November of 2013, respectively. *Remington* Compl. ¶¶ 2-3. In December of 2014, Remington and Durakovic brought a class action against J.B. Hunt in Middlesex Superior Court, asserting violations of the Massachusetts Independent Contractor Statute, Mass. Gen. Laws ch. 149, § 148B,[2] (*Remington* Count I) and the

---

[1] The term owner-operator driver derives from the fact that Remington and Durakovic lease the trucks that they drive to J.B. Hunt. For a history of the owner-operator business model, *see* Douglas C. Grawe, *Have Truck, Will Drive: The Trucking Industry and the Use of Independent Owner-Operators over Time*, 35 Transp. L.J. 115 (2008).

[2] Under section 148B, a worker is properly classified as an independent contractor if the employer can show that:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (2) the service is performed outside the usual course of the business of the employer; and,
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

*Id.*

Massachusetts Wage Act, Mass. Gen. Laws ch. 149, §§ 148, 150 (*Remington* Count II), or, in the alternative, unjust enrichment (*Remington* Count III). Remington alleges that J.B. Hunt hires two classes of truck drivers – employee drivers and owner-operator drivers. *Remington* Compl. ¶ 11. While the job descriptions and work requirements are essentially the same for both classes, *id*. ¶¶ 14-17, 26-41, owner-operator drivers do not receive the same benefits as do the employee drivers, including paid vacation time, personal days, and sick days. *Id.* ¶ 18. Remington also alleges that J.B. Hunt improperly deducts company expenses from the pay of the owner-operator drivers, including the costs of equipment repairs, cargo loss and damage, vehicle insurance, and administrative fees. *Id*. ¶¶ 19-24.

  J.B. Hunt removed the *Remington* Complaint to the federal district court on diversity grounds. This court, adhering to its decision in *Schwann v. FedEx Ground Package Sys., Inc.*, 2015 WL 501512 (D. Mass. Feb. 5, 2015), allowed J.B. Hunt's motion to dismiss, determining that the Federal Aviation Administration Authorization Act (FAAAA), 49 U.S.C. § 14501(c)(1), preempted the second prong of the Massachusetts Independent Contractor Statute. *Remington v. J.B. Hunt Transp., Inc.*, 2015 WL 501884, at *1-2 (D. Mass. Feb. 5, 2015).

> The FAAAA explicitly preempts state laws "related to a price, route, or service of any motor carrier . . . with respect to the

> transportation of property." 49 U.S.C. § 14501(c)(1). . . . [T]he First Circuit [has] emphasized that "a statute's 'potential' impact on carriers' prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote, or peripheral." [*Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d, 11,] 21 [(1st Cir. 2014)]. Empirical evidence in this regard is not necessary, and "courts [may] look [ ] to the logical effect that a particular scheme has on the delivery of services or the setting of rates." *Id.* Such "logical effect can be sufficient even if indirect." *Id.*
>
> Looking to such logical (if indirect) effects, the application of section 148B to J.B. Hunt and other similar motor carriers would unquestionably have an impact on "price, route[s], [and] services" by in effect proscribing the carrier's preferred business model.

*Id.*, at *1. The court also held that the second prong of section 148B was not severable from the remaining two prongs, and that enforcing prongs one and three of section 148B against motor carriers would produce the same result – the "'price, route[s], [and] services' offered by motor carriers would be impacted by forbidding the preferred business model." *Id.*, at *2.

The plaintiffs in *Remington* and *Schwann* appealed. While the consolidated appeal was pending, in July of 2015, plaintiff Abe Silfani filed a similar putative class action in Middlesex Superior Court. Silfani had contracted as an owner-operator driver with J.B. Hunt in October of 2013. *Silfani* Compl. ¶ 2. In his Complaint, Silfani alleges that J.B. Hunt failed to pay him the contractually agreed rate for all of the miles, pick-ups, and deliveries that he was required to make (*Silfani* Count I), and because of his

4

misclassification as an independent contractor, *see id.* ¶¶ 22-38, his wages were effectively withheld in violation of the Massachusetts Wage Act (*Silfani* Count II).³ J.B. Hunt promptly removed the *Silfani* Complaint to this court. At the joint request of the parties, the court stayed the *Silfani* matter pending the outcome of the *Remington* and *Schwann* appeals. *See Silfani* Dkt. # 12.

On appeal, the First Circuit agreed with this court that the FAAAA preempted the second prong of section 148B, *see Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 437-440 (1st Cir. 2016), but disagreed with the ruling of non-severability. *Id.* at 442 ("We therefore think that the legislature's plain aim in enacting this statute favors two-thirds of this loaf over no loaf at all as applied to motor carriers with respect to the transportation of property."). The First Circuit also reversed this court's holding that the FAAAA preempted prongs one and three of section 148B, not on substantive grounds, but "based on FedEx's decision not to advance any argument that Prongs 1 and 3 were preempted by the FAAAA." *Remington v. J.B. Hunt Transp.*, No. 15-1252 (1st Cir. Feb. 22, 2016).

---

³ Silfani also makes an alternative equitable claim of unjust enrichment against J.B. Hunt (*Silfani* Count III).

On remand, the court consolidated the *Remington* and *Silfani* cases for pretrial proceedings.[4] In May of 2016, J.B. Hunt filed a renewed motion to dismiss the Complaints. The court heard oral argument on the motion on August 31, 2016.

## DISCUSSION

Rooted as it is in the Supremacy Clause of the United States Constitution, federal preemption is a "pure question of law." *United States v. Rhode Island Insurers' Insolvency Fund*, 80 F.3d 616, 619 (1st Cir. 1996). Noting the three separate categories of preemption – express, field, and conflict, *see SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530-531 (1st Cir. 2007) – J.B. Hunt argues that plaintiffs' claims are preempted not only because they conflict with the federal Truth-in-Leasing regulations, 49 C.F.R. Part 376, but also because the Truth-in-Leasing regulations occupy the entire field of owner-operator driver compensation. Conflict preemption arises "when compliance with both state and federal statutes and regulations is a physical impossibility, or when compliance with the state statute would frustrate the purposes of the federal scheme." *Id.* at 531. Field preemption occurs when "Congress [] enact[s] a regulatory scheme 'so pervasive as to make

---

[4] The parties in *Remington* and *Silfani* are represented by the same attorneys.

reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* at 530 (citation omitted). "Federal statutes and the regulations adopted thereunder have equal preemptive effect." *Id.*

The court agrees with J.B. Hunt that the Truth-in-Leasing regulations preempt Remington's allegations of improper deductions insofar as these deductions constitute permitted cost-sharing under a compliant lease. The Truth-in-Leasing regulations govern "[t]he leasing of equipment with which to perform transportation regulated by the Secretary [of Transportation]." 49 C.F.R. § 376.1. The regulations mandate that when "[an] authorized carrier [] perform[s] authorized transportation in equipment it does not own," "[t]here shall be a written lease granting the use of the equipment." 49 C.F.R. § 376.11.

> Section 376.12 sets out the requirements of a compliant written lease.
>
> The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

49 C.F.R. § 376.12(c)(1). With respect to operational costs, "[t]he lease shall clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of

such items." 49 C.F.R. § 376.12(e). Although the lessee is required to obtain certain types of insurance for its operations, 49 C.F.R. § 376.12(j)(1),[5] the regulations leave it to the parties to negotiate the responsibility for other types of insurance.[6]

The regulations further permit the lessee to make deductions from the lessor's compensation for cargo or property damage.

> The lease shall clearly specify the conditions under which deductions for cargo or property damage may be made from the lessor's settlements. The lease shall further specify that the authorized carrier must provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor. The written explanation and itemization must be delivered to the lessor before any deductions are made.

49 C.F.R. § 376.12(j)(3). The regulations finally permit the carrier to hold in escrow funds or require a performance bond of the lessor and to make specified deductions for obligations incurred by the lessor. *See* 49 C.F.R. § 376.12(k).

---

[5] "The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. [§] 13906." *Id.*

[6] "The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance. If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor." *Id.*

Plaintiffs' leases[7] with J.B. Hunt, consistent with the Truth-in-Leasing regulations, authorized J.B. Hunt to make the contested deductions. With respect to operational expenses,

> Contractor [(plaintiffs)] shall bear the [costs] incurred in performing the transportation services requested by Carrier under this lease agreement. Those expenses are limited to: all fuel, oil, tires and equipment, accessories, or devices used in connection with the operation of the equipment; maintenance costs including repairs; taxes and assessments, fuel and fuel use taxes; fines and penalties resulting solely from the acts or omissions of Contractor and its employees; insurance costs relating to insurance coverage required to comply with this agreement; federal highway use tax on the equipment, federal, provincial, state or city income taxes, and any self-employment or payroll taxes; and any sales, use, excise and other taxes due and owing to ownership or operation of the equipment. Contractor shall also bear any expenses necessary to maintain the equipment in compliance with all applicable federal and state safety laws and regulations.

Silfani Lease ¶ 12(c). With respect to insurance,

> [c]arrier [(J.B. Hunt)] will provide primary insurance for the protection of the public pursuant to USDOT regulations

---

[7] A copy of Silfani's lease with J.B. Hunt was submitted as an exhibit to J.B. Hunt's initial motion to dismiss in that case. *See* Dkt. #7-1 (Silfani Lease). On a motion to dismiss, the court may consider "documents the authenticity of which are not disputed by the parties; [] official public records; [] documents central to plaintiffs' claim; or [] documents sufficiently referred to in the complaint." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (citation omitted). As Silfani alleges a claim for breach of contract, the contract is integral to the claim. The court has no reason to believe that Remington and Durakovic's contracts with J.B. Hunt materially differ from Silfani's.

> presently found under 49 U.S.C. [§] 13906. Non-Trucking "Bobtail" insurance must be provided by Contractor in the amount of $1,000,000 per occurrence and Carrier will be provided with a suitable certificate of insurance naming Carrier as additional insured. If Contractor desires to purchase insurance through Carrier's insurance agent, Contractor will so signify by signing Appendix C of this Agreement and will authorize a deduction from compensation in the amount shown thereon. Carrier will provide Contractor with a copy of any policy for which a deduction is agreed to upon request.

*Id.* ¶ 13. Plaintiffs consented to indemnify J.B. Hunt for shortage, loss, and cargo damage.

> If there is any loss, shortage or damage of the freight when in Contractor's possession, Contractor shall indemnify Carrier as specified in Paragraph 20 of this Agreement. In the event of any such claim, Carrier will deliver to Contractor a written explanation and itemization of any deductions for cargo or property damage made from Contractor's compensation prior to taking such deduction from Contractor's compensation.

*Id.* ¶ 16. Plaintiffs also agreed to provide J.B. Hunt with escrow funds set at a minimum of $1,500, *id.* ¶ 24(a), and acknowledged that J.B. Hunt could use the funds to offset advances made to the plaintiffs for cost incurred because of losses or damage to cargo. *See id.* ¶¶ 24(b), 22-23.

It is clear from the lease documents that plaintiffs' claim of improper business expense deductions under the Massachusetts Independent Contractor Statute and Wage Act conflicts with the provisions of the Truth-in-Leasing regulations.

> [A] direct, facial contradiction between state and federal law is not necessary to catalyze an 'actual[] conflict' within the doctrinal parameters of the Supremacy Clause . . . [as] a state law or regulation cannot take root if it looms as an obstacle to the achievement of the full purposes and ends which Congress has itself set out to accomplish.

*KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 49 (1st Cir. 1999) (citation omitted, ellipses in *KKW*). What is explicitly permitted by federal regulations cannot be forbidden by state law. A good illustration is *Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1 (1st Cir. 2007). In that case, the First Circuit held that a state law requiring telephone carriers to charge lower rates in some circumstances was preempted by a Federal Communications Commission order permitting the carrier to charge potentially higher rates. *Id.* at 9. In *Rodriguez v. RWA Trucking Co., Inc.*, 219 Cal. App. 4th 692 (2013), as modified (Sept. 20, 2013), publication ordered sub nom. *Rodriguez v. RWA Trucking Co.*, 352 P.3d 881 (Cal. 2015), the California Court of Appeals similarly held that a California state insurance law that prohibited the charge back of insurance costs to truck drivers was preempted by the Truth-in-Leasing regulations.

> [W]e conclude that if state insurance laws prohibit RWA from charging back its liability insurance costs to its drivers, those laws are preempted by 49 C.F.R. section 376.12. As we have said, 49 C.F.R. section 376.12 permits motor carriers to charge back liability insurance costs to its drivers, so long as the amounts of

11

> those chargebacks are clearly specified. In contrast, if California insurance law is interpreted as plaintiffs suggest, it would *forbid* such chargebacks unless the motor carriers were licensed to sell insurance. Thus, under plaintiffs' interpretation of California law, it would prohibit precisely the kind of chargebacks that federal law permits.

*Id.*, 219 Cal. App. 4th at 710.

If the Massachusetts Independent Contractor Statute and Wage Act were to be interpreted to require a carrier, such as J.B. Hunt, to bear the entirety of the expense associated with an equipment lease,[8] these state laws would be preempted to this extent by the Truth-in-Leasing regulations. While the regulations require the carrier to obtain insurance for the protection of the public, it is for the leasing parties to decide how other business expenses (and rewards) associated with a lease are to be allocated. State law cannot dictate contract terms when federal law provides the freedom to negotiate.

The court disagrees with J.B. Hunt, however, in its broader contention that the Truth-in-Leasing regulations occupy the entire field of owner operator compensation. Contrary to J.B. Hunt's suggestion, the regulations use the term "compensation" narrowly to mean "the amount to be paid."

---

[8] J.B. Hunt suggests in its papers that if state law was to relieve a truck owner of the burden of bearing any of the expenses associated with ownership, there would be no economic incentive for a carrier to enter into a lease agreement with an owner-operator driver.

> *The amount to be paid* by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease. . . . *The amount to be paid* may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease.

49 C.F.R. § 376.12 (d) (emphasis added). The regulations are silent, however, with respect to potential employment benefits that are not typically an "amount to be paid," such as accrued vacation or sick leave.

Moreover, the regulations are explicitly agnostic on the issue of the carrier-driver relationship. "Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." 49 C.F.R. § 376.12(c)(4). Prior to the insertion of subsection (c)(4) in § 376.12 in 1992, some courts applied a "logo liability rule" in interpreting the Truth-in-Leasing regulations concerning leased equipment to imply an employment relationship with owner-operator drivers as a matter of law as a matter of law. *See, e.g., Rodriguez v. Ager*, 705 F.2d 1229, 1231-1236 (10th Cir. 1983). The Interstate Commerce

Commission (ICC), the federal agency that had promulgated[9] the regulations, disagreed.

> As noted by the comments, certain courts have relied on Commission regulations in holding carriers liable for the acts of equipment owners who continue to display the carrier's identification on equipment after termination of the lease contract. We prefer that courts decide suits of this nature by applying the ordinary principles of State tort, contract, and agency law. The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist. Our regulations should have no bearing on this subject. Application of State law will produce appropriate results.

*Lease & Interchange of Vehicles (Identification Devices) (49 C.F.R. Part 1057)*, 3 I.C.C.2d 92, 93 (I.C.C. Oct. 10, 1986).

In 1992, in response to a petition by the American Trucking Association, Inc., and the Interstate Truckload Carriers Conference, the ICC codified its position in subsection (c)(4) with the following explanation.

> While most courts have correctly interpreted the appropriate scope of the control regulation and have held that the type of control required by the regulation does not affect "employment" status, it has been shown here that some courts and State

---

[9] The ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803, "eliminated unnecessary ICC regulatory functions and transferred residual functions partly to the Surface Transportation Board within the DOT and partly to the Secretary of Transportation. . . . [A]ll rules legally enacted by the ICC that are not based upon repealed law or were not substantially reenacted by the ICCTA remain[ed] in effect." *Thomas v. Johnson Agri-Trucking*, 802 F. Supp. 2d 1242, 1246 n.14 (D. Kan. 2011).

> workers' compensation and employment agencies have relied on our current control regulation and have held the language to be prima facie evidence of an employer-employee relationship. These State agencies often find that the current regulation evidences the type of control that is indicative of an employer-employee relationship.
>
> We conclude that adopting the proposed amendment will reinforce our view of the neutral effect of the control regulation and place our stated view squarely before any court or agency asked to interpret the regulation's impact. The proposed amendment should eliminate the need for such tribunals to undertake any lengthy legal analysis of the control regulation and lessen the likelihood that they will reach the wrong conclusions. By presenting a clear statement of the neutrality of the regulation, we hope to bring a halt to erroneous assertions about the effect and intent of the control regulation, saving both the factfinders and the carriers time and expense.

*Petition to Amend Lease & Interchange of Vehicle Regulations*, 8 I.C.C.2d 669, 671 (I.C.C. June 29, 1992). Given this unequivocal disclaimer, the court cannot conclude that the Truth-in-Leasing regulations occupy the entire field of owner-operator compensation.[10]

---

[10] The court does not decide at this time whether the FAAAA preempts the application of the remaining first and third prongs of the Massachusetts Independent Contractor Statute to an interstate carrier such as J.B. Hunt. Like FedEx, J.B. Hunt has not made this argument. The court notes, however, that several sessions of the Superior Court have "rejected [the] premise [that defendant may be liable solely under the first and third prongs of section 148B] where it was evident that the effects of all three prongs would have a significant impact on the routes, prices, and services of the motor carrier." *Rice v. Diversified Specialty Pharm., LLC*, 2016 WL 4060956, at *5 (Mass. Super. July 26, 2016), citing *Chambers v. RDI Logistics, Inc.*, 2015 WL 9911425, at *12-14 (Mass. Super. Oct. 26, 2015) (finding that an application of section 148B would have a significant impact

ORDER

For the foregoing reasons, J.B. Hunt's motion to dismiss is <u>ALLOWED IN PART</u> (with respect to Remington's allegations of improper deductions), and otherwise <u>DENIED</u>.[11]  The parties will make a joint submission to the court, no later than September 30, 2016, stating whether they intend, by agreement, to proceed to an appellate review of this court's decision, or to begin discovery (and if so, the parties will include a joint proposed pretrial schedule).

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

on the prices, routes, and services of a carrier, and is thus preempted by the FAAAA).

[11] J.B. Hunt does not argue that Silfani's breach of contract claim is preempted.  J.B. Hunt contends, however, that Silfani's exclusive remedy is under 49 U.S.C. § 14702(a)(2) (which creates a private cause of action for violations of the Truth-in-Leasing regulations).  Silfani, however, does not allege that J.B. Hunt's lease contravenes any provision of the regulations, but rather, that J.B. Hunt did not make the payments that it promised in the lease.  This is properly a claim for breach of contract.